818 F.2d 755
 George WILLIAMS, Jr., et al., on behalf of themselves and
all others similarly situated; The First Born
Church Of the Living God, et al.,
Plaintiffs-Appellants,
v.
CITY OF DOTHAN, ALABAMA; Kenneth Everett, Mayor;
Commissioners John H. Glanton, Jr., Raimon G. Thomas, Matt
Bullard, S.A. Cherry, Sr., and their successors and agents
in their official capacities, Defendants-Appellees.
 No. 86-7104.
 United States Court of Appeals,
Eleventh Circuit.
 June 5, 1987.
 
 Lipman & Weisberg, David M. Lipman, Robert E. Weisberg, Miami, Fla., Abigail Turner, Legal Services Corp. of Alabama, Mobile, Ala., Steven D. Caley, Legal Services Corp. of Alabama, Dothan, Ala., for plaintiffs-appellants.
 Buntin & Cobb, P.A., T.E. Buntin, Jr., D. Taylor Flowers, Dothan, Ala., James R. Seale, James Walter, Jr., Capell, Howard, Knabe & Cobbs, P.A., Montgomery, Ala., for defendants-appellees.
 Appeal from the United States District Court for the Middle District of Alabama.
 Before GODBOLD and Hill, Circuit Judges, and ESCHBACH*, Senior Circuit Judge.
 GODBOLD, Circuit Judge:
 
 
 1
 In this case black property owners of the City of Dothan, Alabama, attack as unconstitutionally discriminatory assessments made against them by the city for street paving and sewer improvements. The district court ruled in favor of the city.[1] We reverse and remand for granting of relief.
 
 
 2
 Plaintiffs represent the class of black citizens who have or will have to pay special assessments under the city's Special Improvement Project 31.[2]
 
 I. Procedural Background
 
 3
 This is a second appeal. Originally, on Dothan's motion for summary judgment, the district court found that plaintiffs' action was barred by statutory and common law estoppel and the Tax Injunction Act, 28 U.S.C. Sec. 1341 (1982). We reversed this decision in Williams v. City of Dothan, 745 F.2d 1406 (11th Cir.1984) (Williams I ), holding that plaintiffs' action was not barred under Alabama law by statutory or equitable estoppel and that the Tax Injunction Act did not apply. Id. at 1410-13. We also ordered the district court to permit plaintiffs to amend their complaint to add an allegation that the city's actions constituted a violation of its continuing responsibilities under an earlier order of the district court in Yelverton v. Driggers, 370 F.Supp. 612 (M.D.Ala.1974).[3]
 
 
 4
 After a non-jury trial on remand, the district court again ruled in favor of Dothan. The court reasoned that based on facts unavailable to the Eleventh Circuit in Williams I, plaintiffs' action was still barred by statutory and equitable estoppel. The court also held that we misconstrued Alabama law in Williams I when we concluded that the Tax Injunction Act did not apply. On the request of both parties the court decided all issues presented, even though it had found that the action was barred. The court held that plaintiffs had failed to prove discriminatory intent and discriminatory effect. It also held that plaintiffs had failed to demonstrate that the case involved a violation of the Yelverton order because municipal services were not an issue in that case and because the order had violated the specificity requirement of Fed.R.Civ.P. 65(d). In an amendment to its opinion the court further held that, even if the Yelverton order applied, Dothan had complied with it.
 
 II. Law of the Case
 
 5
 The district court held that plaintiffs' action was barred by "common law estoppel and a statutory estoppel pursuant to both the Federal Tax Injunction Act and the provisions of CODE OF ALABAMA [1975], Sec. 11-48-26." Williams v. City of Dothan, No. 82-226-S, Mss. at 20 (M.D.Ala. Sept. 30, 1985) (Williams II ). Although the court found that new evidence was presented at the bench trial that supported these findings, the Eleventh Circuit, as discussed more fully below, had relied on the same evidence in Williams I and clearly resolved these issues against Dothan. The district court therefore erred in reconsidering these issues on remand.
 
 
 6
 Under the law of the case doctrine, findings of fact and conclusions of law by a court of appeals are binding on all subsequent proceedings in the same case. Piambino v. Bailey, 757 F.2d 1112, 1120 (11th Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 2889, 90 L.Ed.2d 976 (1986); Dorsey v. Continental Cas. Co., 730 F.2d 675, 678 (11th Cir.1984), Baumer v. U.S., 685 F.2d 1318, 1320 (11th Cir.1982). There are three exceptions which, if present, justify a district court's reconsideration of issues previously decided by a court of appeals: "(1) substantially different evidence is produced at a subsequent trial; (2) controlling authority compels a contrary decision of law applicable to the issue; or (3) the prior decision was clearly erroneous and would work manifest injustice." Dorsey, 730 F.2d at 678 n. 2; see also Baumer, 685 F.2d at 1320; EEOC v. International Longshoremen's Ass'n, 623 F.2d 1054, 1058 (5th Cir.1980), cert. denied, 451 U.S. 917, 101 S.Ct. 1997, 68 L.Ed.2d 310 (1981). No exception is applicable here. The district court violated the law of the case established in Williams I by reconsidering the estoppel and Tax Injunction Act issues.
 
 
 7
 On remand the district court found that plaintiffs' action was barred by statutory estoppel because under Ala.Code Sec. 11-48-26 citizens waived their right to protest special assessment projects if they failed to file objections or protests in writing. The court relied on the fact that plaintiffs' first written objection came at the second public hearing in 1982,[4] which took place after the construction in Project 31 had been completed. This same evidence, however, was before us in Williams I; we held that plaintiffs' action was not barred by Sec. 11-48-26 because plaintiffs had "objected orally at least twice, and had presented written objections at least once, during City Commission meetings held before the assessments were finalized." Williams I, 745 F.2d at 1410.
 
 
 8
 The district court also held that plaintiffs' action was barred by equitable estoppel because plaintiffs failed to appeal the city commission's determination of the maximum possible assessment in Project 31 before the city began construction on the project. The court reasoned that had plaintiffs appealed the decision the city would not have proceeded with construction until the objections had been resolved. Under Alabama law three conditions must be met to find equitable estoppel:
 
 
 9
 The actor, who usually must have knowledge of the true facts, communicates something in a misleading way, either by words, conduct or silence. The other relies upon that communication. And the other would be harmed materially if the actor is later permitted to assert any claim inconsistent with his earlier conduct.
 
 
 10
 Id. at 1411 (quoting Mazer v. Jackson Ins. Agency, 340 So.2d 770, 773 (Ala.1976)). Again, with the same facts before us, we concluded in Williams I that equitable estoppel was inapplicable because Dothan knew of plaintiffs' objections to the high assessments prior to beginning construction in Project 31. Id.
 
 
 11
 Finally, the district court held that plaintiffs' action was barred by the Tax Injunction Act. Williams I held that the Tax Injunction Act was inapplicable because plaintiffs did not have a "plain, speedy and efficient remedy" under state law. Id. at 1412. In reaching this conclusion the decision rejected the district court's earlier ruling that plaintiffs could assert their due process and equal protection claims under the procedures set out in Ala.Code Sec. 11-48-36. We held that Alabama law limits review of an assessment by a trial court to whether the assessment exceeds the increase in value to the property as a result of the improvement. Id. at 1412-13. On remand the district court held that "after having thoroughly studied the cases cited by the Court of Appeals in Williams [I]," it was "of the firm opinion" that appeals in Alabama "are not limited to the cost-value-assessment issue." Williams II, Mss. at 13-14. Although the district court's interpretation of cases cited in Williams I is reasonable, its interpretation is not so compelling that the Eleventh Circuit's holding is "clearly erroneous." The district court erred in reconsidering the Tax Injunction Act issue.
 
 III. Plaintiffs' Burden of Proof
 
 12
 The district court held that to succeed on the merits of their discrimination claim plaintiffs had to prove discriminatory intent by Dothan. Plaintiffs argue on appeal, as they did before the district court, that they need only show that Project 31 had a discriminatory effect on Dothan's black citizens because Dothan's conduct constituted a perpetuation of past discrimination and a violation of the city's continuing responsibilities under Yelverton.[5] Although the district court properly concluded that plaintiffs must prove discriminatory intent even if they alleged perpetuation of past discrimination, the court erred in holding that plaintiffs' action did not constitute an enforcement action of the Yelverton order. Plaintiffs, therefore, need only prove discriminatory effect.[6]
 
 A. Perpetuation of Past Discrimination
 
 13
 Proof of discriminatory intent is required to show a violation of the Fourteenth Amendment. Village of Arlington Heights v. Metropolitan Hous. Dev. Corp., 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977); Washington v. Davis, 426 U.S. 229, 242, 96 S.Ct. 2040, 2049, 48 L.Ed.2d 597 (1976). A plaintiff must prove discriminatory intent even if a history of past discrimination exists. City of Mobile v. Bolden, 446 U.S. 55, 74, 100 S.Ct. 1490, 1503, 64 L.Ed.2d 47 (1980) (plurality decision).[7] The cases cited by plaintiffs are inapposite because they either involve statutory actions in which proof of discriminatory intent is not required under the statute, see, e.g., International Brotherhood of Teamsters v. U.S., 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) (Title VII); Fullilove v. Klutznick, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980) (Public Works Employment Act) or school desegregation cases in which courts apply a different standard, see Georgia State Conference v. Georgia, 775 F.2d 1403, 1414 n. 13 (11th Cir.1985).
 
 B. Enforcement of Yelverton Order
 
 14
 The district court held that this action was not properly an action to enforce the order in Yelverton because: (1) the Yelverton order appears to have been based on the erroneous assumption that municipal services were an issue in the case; and (2) the Yelverton order violated the specificity requirement of Fed.R.Civ.P. 65(d). Williams II, Mss. at 21-24.
 
 
 15
 In Yelverton the district court held that Dothan's system of multi-member districting for the city commission improperly diluted the political power of its black citizens. In so ruling the court concluded that "there has been and still remains substantial and pervasive racial discrimination in Dothan." Yelverton, 370 F.Supp. at 618. The court made specific factual findings regarding discrimination in Dothan, including "that governmental services have been disproportionately bad in the black areas" and that the city had exhibited "a clear lack of responsiveness to the physical needs of its black citizens." Id. In fashioning its remedies the court recognized that a new city commission had just been elected, including one black member. These officials testified that they planned to improve services to blacks in the community. The court therefore ordered relief that was the least "disruptive to the orderly function of the city government." Id. at 619. In its February 7, 1974 companion order to Yelverton the district court expressly enjoined Dothan "from operating the City government in a manner which denies to the black citizens of Dothan ... their right to equal treatment in the provision of governmental services." The court further ordered that Dothan had "an affirmative duty to provide blacks with their proportionate share of government services ... in order to remedy the effects of past denial to blacks of access to the political process." The court also required the parties to submit periodic reports concerning the city's compliance with the order.
 
 
 16
 1. Lack of authority to invalidate Yelverton order
 
 
 17
 A district court has the authority to interpret a previous order by that court in a subsequent enforcement action. Alabama Nursing Home Ass'n v. Harris, 617 F.2d 385, 387-88 (5th Cir.1980). Furthermore, "[g]reat deference is due the interpretation placed on the terms of an injunctive order by the court who issued and must enforce it." Id. at 388. But, however Dothan characterizes the district court's action here, the end result is that the court questioned the legality of the Yelverton order and held that it was not enforceable. This constitutes more than mere interpretation of the scope of a prior order, and Alabama Nursing Home is therefore inapplicable.
 
 
 18
 "It is beyond question that obedience to judicial orders is an important public policy. An injunction issued by a court acting within its jurisdiction must be obeyed until the injunction is vacated or withdrawn." W.R. Grace & Co. v. International Union of the United Rubber Workers of America, Local 759, 461 U.S. 757, 766, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298 (1983); see also Watson v. Henderson, 493 F.2d 912, 913 (5th Cir.1974). Dothan never challenged the Yelverton order by direct appeal or motion for post-judgment relief. It cannot now, more than ten years later, object to the legality of the order. Combs v. Ryan's Coal Co., 785 F.2d 970, 979 (11th Cir.), cert. denied, --- U.S. ----, 107 S.Ct. 187, 93 L.Ed.2d 120 (1986).[8]
 
 2. Yelverton order not invalid
 
 19
 Even if the district court had authority under Alabama Nursing Home to "invalidate" the Yelverton order, it abused its authority. A district court has the inherent equitable power to fashion a remedy appropriate to the wrong committed. See U.S. v. Paradise, --- U.S. ----, 107 S.Ct. 1053, 1073, 94 L.Ed.2d 203 (1987) (plurality); Milliken v. Bradley, 433 U.S. 267, 281-82, 97 S.Ct. 2749, 2757-58, 53 L.Ed.2d 745 (1977); Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 15-16, 91 S.Ct. 1267, 1275-76, 28 L.Ed.2d 554 (1971); Dowdell v. City of Apopka, 698 F.2d 1181, 1186 (11th Cir.1983). In reaching its decision in Yelverton that Dothan's multi-member districting system improperly diluted the political power of blacks, the district court relied on evidence that the city had provided inadequate public services to black citizens in comparison to white citizens. Rather than order a complete change in the city government the Yelvertoncourt exercised judicial restraint and ordered, in part, that the city treat its black citizens equally in the provision of governmental services and provide blacks with a proportionate share of governmental services. That order was within the inherent equitable remedial authority of the court.
 
 
 20
 The district court here also found that the Yelverton order was a mere "obey the law" injunction that violates the specificity requirement of Rule 65(d). See Payne v. Travenol Laboratories, Inc., 565 F.2d 895, 897-98 (5th Cir.), cert. denied, 439 U.S. 835, 99 S.Ct. 118, 58 L.Ed.2d 131 (1974). As this court has noted, Rule 65(d) should not be applied strictly; rather the inquiry should be whether the parties subject to the injunctive order understood their obligations under the order. Combs, 785 F.2d at 978-79. The language of the Yelverton order, that Dothan provide blacks with "equal treatment" and "their proportionate share" of "governmental services," suggests that the court intended to include such "governmental services" as street paving and sewer improvements.[9] Dothan listed its special assessment projects, including Project 31, in its two compliance reports filed with the district court as required by Yelverton, indicating that it knew that its obligations under the Yelverton order included paving and sewer improvements in black neighborhoods. The order therefore did not violate the specificity requirement of Rule 65(d). See id. at 979.
 
 IV. Discriminatory Effect of Project 31
 
 21
 The district court held that plaintiffs failed to prove discriminatory effect. First, the court explained that, although the evidence would "tend to show discrimination against black neighborhoods," if one focused on the last three major special assessment projects, an examination of all special assessment projects since 1949 reveals that the assessment in Project 31 was not out of line with assessments in prior projects. Second, the court held that although it would appear that Project 31 had a discriminatory effect on blacks if one compared only Projects 30 and 31, any discriminatory effect was cancelled out by the surrounding circumstances. Both of these findings are clearly erroneous.
 
 A. Computation of the City's Contribution
 
 22
 The district court concluded that Dothan's contribution to Project 31 was not significantly out of line with prior projects primarily because it found that the city had contributed 30.2% of the total costs to Project 31 and the average city contribution to special projects since 1949 was 31.43%.[10] Plaintiffs argue that this finding is clearly erroneous because it artificially inflates Dothan's contribution to Project 31 by including in its computation of the city's contribution the costs for related project improvements that would not be assessed against property owners and the costs for sewer improvements, both of which were not assessed in previous projects. Dothan's contribution to Project 31 would have been 14.8% if the court had not included non-assessed related project improvements and sewer improvements in its computation. Plaintiffs contend that this last figure more accurately reflects Dothan's actual contribution to Project 31 in comparison with previous projects.[11] We agree.
 
 
 23
 Dothan admitted in response to a Fed.R.Civ.P. 36 request for an admission of fact that its contribution to Project 30 was 48.7%. This figure does not include non-assessed related project improvements. Because Dothan never sought to withdraw or amend its admission, the court was not free to reject this "conclusively established" fact even if it "[found] more credible the evidence of the party against whom the admissions operate." Brooks Village N. Assocs. v. General Elec. Co., 686 F.2d 66, 73 (1st Cir.1982). Dothan's argument that plaintiffs were not prejudiced by the district court's computation and that a later admission explained that its prior admission was simply based on the Project 30 assessment roll, which did not include non-assessed related project improvements, does not change the conclusive effect of its prior admission, which admitted the city's contribution without any explanation or qualification. See Fed.R.Civ.P. 36. The district court therefore erred by including the costs of non-assessed related project improvements and sewer improvements in Dothan's contribution to Project 31 when the city's contribution to Project 30 was conclusively established excluding these costs.
 
 
 24
 Moreover, non-assessed related project improvements were not included on special project assessment rolls prior to Project 31 and, therefore, should not be included in computing the city's contribution to Project 31 for purposes of comparison with previous projects. Although Dothan contends that the evidence does not demonstrate conclusively that previous projects did not include related project improvements, it can point to only one project, Project 14, in which the assessment roll may have included related project improvements. The related project improvements in Project 14, however, are significantly different from the related project improvements in Project 31. In Project 14 the related project improvements involved lowering and repairing water mains and sanitary sewers to accommodate the construction and paving of the streets and therefore were assessable against the property owners. In contrast, the related improvements in Project 31 involved the construction of new water mains and sanitary sewer improvements independent of the construction and paving of the streets. Thus, they were not a necessary part of the assessment project and therefore were not assessable.
 
 
 25
 The inclusion of Dothan's cost for related project improvements to the water and sewer systems as part of the city's contribution to Project 31 is inconsistent with the city's established practice of providing these services independent of any special assessment project. Dothan has never assessed property owners for water system improvements. Nor has it required that such water system improvements be completed as part of any special assessment project. Prior to 1977 Dothan constructed sewer system improvements at no cost to the property owner and without regard to whether a special assessment project was involved. Although Dothan now assesses property owners for sewer system improvements, the inclusion of Dothan's costs for such improvements in the computation of the city's contribution to Project 31, where such costs were not included in previous projects, inaccurately increased the city's contribution to Project 31 as compared to previous projects. By including the costs of non-assessed related project improvements and sewer improvements in the city's contribution to Project 31, the district court artificially inflated Dothan's contribution to the project and therefore inaccurately evaluated the discriminatory effect of Project 31 on plaintiffs.
 
 
 26
 Prior to 1975 Dothan discriminated against its black citizens in the provision of government services. Yelverton, 370 F.Supp. at 618-19. The black residential neighborhoods in Dothan had significantly fewer paved streets and less sewer service than predominantly white neighborhoods. Project 31 was the first major project since Yelverton in a primarily black residential neighborhood.[12]
 
 
 27
 The Yelverton order required Dothan to extend government services to black neighborhoods. Black citizens participated in Project 31 in large numbers. As we have described, in previous projects white citizens had been able to procure sewer improvements for which the city paid the entire costs and street paving to which the city contributed an average of 31.43% of the final costs, while in Project 31 the city agreed to contribute only 14.8% of the total costs.[13] Although Dothan did not decrease its contribution to Project 31 because of any intent to discriminate against blacks, the end result was discriminatory--blacks had to pay a higher percentage of the costs for paving and sewer improvements in Project 31 than whites had to pay for similar improvements in past assessment projects.[14] Project 31 therefore had a discriminatory effect on blacks as compared to whites in previous assessment projects.
 
 B. Surrounding Circumstances
 
 28
 The district court also held that any discriminatory effect that Project 31 may have had on Dothan's black citizens was cancelled out by four "relevant surrounding circumstances": (1) blacks were given the same opportunity as whites to participate in Projects 30 and 31; (2) "more than 50 percent of the owners of the property assessed in Project 31 were whites," and therefore "whites shared at least equally with blacks in whatever unfairness, if any, resulted from Project 31"; (3) Mayor Grant and Commissioner Glanton "campaigned heavily in 1973 on a political promise to obtain paving for the black neighborhoods"; and (4) "there is no showing that the other Defendants knew, before adopting the Projects, that they were in a predominantly white or black neighborhood." Williams II, Mss. at 9-10.
 
 
 29
 Only the second factor has any impact on whether Project 31 had a discriminatory effect on blacks. The court's reliance on the other three factors is misplaced. First, the finding that blacks and whites had an equal opportunity to participate in Project 30 conflicts with the district court's finding made here and in Yelverton that prior to 1975 Dothan discriminated against its black citizens in the provision of government services. Second, the finding that Mayor Grant and Commissioner Glanton campaigned in 1973 on the political promise of obtaining paving for the black community is not based on evidence in the record. Finally, the finding that the other defendants did not know whether Project 30 or 31 was in a predominantly black or white neighborhood when adopted is not supported by the evidence. In any event, these last two findings only go towards the city's intent to discriminate, which is not an issue.
 
 
 30
 Although the court's finding that any discriminatory effect of Project 31 on blacks is nullified because white citizens owned 50% of the assessed property in the project is relevant, it does not eliminate the discriminatory effect of Project 31 on Dothan's black citizens. When considering disparate effect the focus should not be on absolute numbers but rather on whether the challenged requirements "operate to disqualify Negroes at a substantially higher rate than white[s]." Griggs v. Duke Power Co., 401 U.S. 424, 426, 91 S.Ct. 849, 851, 28 L.Ed.2d 158 (1971). In Griggs the Supreme Court noted that the challenged "standards had been applied fairly to whites and Negroes alike." Id. at 429, 91 S.Ct. at 852. The Court held, however, that these standards had a discriminatory impact on blacks and, because they were not job-related, were therefore unlawful. Id. at 431-32, 91 S.Ct. at 853-54. Although the action in Griggs was brought by a class representing incumbent black employees of Duke Power Company, the Supreme Court focused on the percentage of blacks and whites in general, compared to their population in society according to the most recent census, who had not completed high school or who had failed the relevant aptitude tests. Id. at 430 n. 6, 91 S.Ct. at 853 n. 6; see also Robinson v. Union Carbide Corp., 538 F.2d 652, 660-61 (5th Cir.1976) (compared percentage of blacks in supervisory positions with percentage of blacks in local population and concluded that company's hiring practice had a discriminatory effect on blacks), modified on other grounds, 544 F.2d 1258, cert. denied, 434 U.S. 822, 98 S.Ct. 65, 54 L.Ed.2d 78 (1977); Johnson v. Goodyear Tire & Rubber Co., 491 F.2d 1364, 1372 n. 22 (court should focus on "the percentage of each race which passes or fails a particular exam requirement not the absolute difference between the two races.").
 
 
 31
 Although blacks owned only slightly less than 50% of the streets paved in Project 31, blacks owned only 16.7% of the private homes in Dothan at the time. In addition, 73% of all assessed streets paved in Project 31 were owned or occupied by blacks, even though blacks only comprised 25.7% of the population. This is important because although the owners of the property will pay the actual assessment, the owners can be expected to pass on their costs to their tenants. Project 31 therefore had a discriminatory effect on Dothan's black citizens. Dothan may not escape its responsibilities under Yelverton on the basis that 50% of the property owners who had to pay the unusually high assessment in Project 31 were white, when in fact the actual number of whites affected by Project 31 was small in comparison to the number of whites who benefited from previous assessment projects.
 
 V. Conclusion
 
 32
 Dothan's assessment in Project 31 had a discriminatory effect on the city's black citizens and violated the city's continuing responsibilities under Yelverton. We therefore reverse the judgment in favor of Dothan and remand the case to the district court for the determination of and award of appropriate relief.[15] The appropriate remedy is a matter for the district court in the first instance.
 
 
 33
 REVERSED and REMANDED.
 
 HILL, Circuit Judge, dissenting:
 
 34
 Plaintiff brought this class action, alleging that the City of Dothan discriminated against blacks by imposing unreasonably high assessments against property owners in connection with costs on Project 31 (a street paving project affecting majority white owned property in a predominantly black neighborhood). The primary evidence relied upon by the plaintiffs was the disparity between the City's percentage of contribution toward Project 30 (paving project in a predominantly white neighborhood) and the city's percentage of contribution toward Project 31. The district court specifically found that (1) the City did not intend to discriminate against blacks in the implementation of Project 30 or 31 and (2) the implementation of these projects did not have a discriminatory effect. Plaintiffs do not challenge the district court's finding that the city did not act with discriminatory intent in carrying out these two projects. Plaintiffs contend that they need not prove discriminatory intent, because the proceeding is an action to enforce an injunction which had issued in 1974 by the district court in Yelverton v. Driggers, 370 F.Supp. 612 (M.D.Ala.1974).
 
 
 35
 The Yelverton proceeding was a voting rights case in which the constitutionality of a reapportionment plan for the city of Dothan was challenged. In Yelverton, the district court issued an order which, among other things, observed and declared that the city of Dothan was under "an affirmative duty to provide to blacks their proportionate share of governmental services, employment, and rights of representation on city boards and commissions, in order to remedy the effects of past denial to blacks of access to the political process." In this enforcement action the district court is required to interpret that order. The district court's interpretation of its order in Yelverton is reasonable. Therefore it is the duty of this court to abide by that interpretation.
 
 
 36
 Federal district courts inherently possess broad powers in administering an equitable remedy such as an injunction:
 
 
 37
 The latitude of the equitable discretion of a federal court, or of any court sitting in equity, is indeed broad.... The equity jurisdiction of a court is said to be distinguished by the qualities of "[f]lexibility rather than rigidity ... [, and by] mercy and practicality." Hecht v. Bowles, 321 U.S. 321, 329-30 [64 S.Ct. 587, 591-92, 88 L.Ed. 754] (1944). A flexible remedy is thus in the highest traditions of a court of equity.
 
 
 38
 Yelverton v. Driggers, 370 F.Supp. 612, 619-20 (M.D.Ala.1974); see also United States v. Georgia Power Co., 634 F.2d 929, 932 (5th Cir. Unit B 1981) (power to modify equitable decrees is "inherent in the jurisdiction of chancery"), vacated, 456 U.S. 952, 102 S.Ct. 2026, 72 L.Ed.2d 477 (1982). As the United States Court of Appeals for the Eighth Circuit noted in Booker v. Special School District No. 1, 585 F.2d 347, 352-53 (8th Cir.1978), cert. denied, 443 U.S. 915, 99 S.Ct. 3106, 61 L.Ed.2d 878 (1979):
 
 
 39
 There is no question that in a proper case a federal district court that has issued an injunction may vacate or modify it if it is established that to continue it in force or without modification would work an inequitable result.... [T]he basic responsibility for determining whether an injunction should be dissolved or maintained in force or whether and to what extent it should be modified rests primarily on the shoulders of the district court that issued the injunction in the first place.
 
 
 40
 Indeed, a district court maintains the power to modify its injunction, even though the original order was neither objected to nor appealed. McIntyre v. Morgan, 624 F.Supp. 658, 661 (S.D.Ind.1985). This power to modify an injunction will only be disturbed on review upon a showing of abuse of discretion. 19 Federal Procedure, Lawyer's Ed. Sec. 47:135 (1983). No abuse of discretion occurred here.
 
 
 41
 After reviewing the files and records of the Yelverton proceeding, the district court concluded that municipal services were not within the scope of the litigation or of the original order. The court found that inequality in public improvements was never litigated in the Yelverton proceeding. Essentially, the court concluded that discrimination in assessments for public improvements was so tangential to the voting rights issues raised in Yelverton, that it would be inequitable to apply the above quoted Yelverton language to the present proceeding as an injunction. The district court acted properly in considering the intended scope of its own injunction. See Flavor Corp. v. Kemin Indus., Inc., 503 F.2d 729 (8th Cir.1974) (authority of district court to define scope of injunction). The district court was in a better position than this appellate body to determine whether the issue of discrimination in public services was litigated in Yelverton.
 
 
 42
 The district court also concluded that its previous order in Yelverton lacked the specificity required of an enforceable injunction. The district court found the portion of the Yelverton order dealing with municipal services to be "nothing more than an articulation of what the law requires." Accordingly, the district court characterized this portion of the order to be a mere "obey the law" injunction in violation of Fed.R.Civ.P. 65(d) ("Every order granting an injunction ... shall be specific in terms ..."). An injunction which merely prohibits a defendant from violating the law cannot be sustained. Meyer v. Brown & Root Constr. Co., 661 F.2d 369, 373 (5th Cir.1981); Payne v. Travenol Laboratories, Inc., 565 F.2d 895, 898 (5th Cir.1978), cert. denied, 439 U.S. 835, 99 S.Ct. 118, 58 L.Ed.2d 131 (1978). The portion of the Yelverton order commenting upon the provision of municipal services does nothing more than require the City of Dothan to provide such services on a non-discriminatory basis. Such an order merely restates the City's constitutional duty to provide municipal services evenhandedly without regard to race. Accordingly, I would uphold the district court's determination that the Yelverton order is inapplicable to the present case, and the plaintiff's burden of proof was not altered by its existence.
 
 
 43
 Even if Yelverton were applicable in this case, plaintiffs must prove, at a minimum, discriminatory effect. After weighing the evidence submitted by the parties, the district court judge found no disparate impact. That finding is due to be accepted by us.
 
 
 44
 In reviewing the factual findings of the district court, we are bound by the clearly erroneous standard. Ante, at 761. The limited nature of such review is demonstrated by the Supreme Court's holding in Anderson v. City of Bessemer, 470 U.S. 564, 573-74, 105 S.Ct. 1504, 1511-12, 84 L.Ed.2d 518 (1985):
 
 
 45
 If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.
 
 
 46
 Under this standard, the district court's findings are not clearly erroneous.
 
 
 47
 To overcome their burden of proving discriminatory effect, plaintiffs attempted to show that the city had contributed significantly less toward Project 31 than toward other projects. Both the plaintiff class and the City of Dothan presented the testimony of expert witnesses on this issue. The expert on behalf of the city testified that the city's percentage of contribution toward street paving projects should include work done on related project improvements (e.g., sewers and water lines). The plaintiffs' expert testified to the contrary. After weighing the testimony and evidence, the district court judge agreed with the city's expert. The district court therefore concluded that the City's percentage of contribution toward Project 31 was 30.2%. The district court proceeded to find that the percentage of contribution for Project 31 was not significantly out of line with other assessments made since 1949 (excluding Project 30).[1] Thus, the district court concluded that no discriminatory effect was present. This finding is not clearly erroneous.[2]
 
 
 48
 Alternatively, the district court found that blacks and whites had an equal opportunity to participate in Project 30 and 31 and that over 50% of the property owners assessed in Project 31 were white. The district court therefore concluded that the implementation of Projects 30 and 31 did not have a discriminatory effect on blacks. Discrimination requires that one party must be favored and another party disfavored. In the context of racial discrimination, members of one race must be favored over members of another race. The City of Dothan, by implementing Project 31, is accused of discriminating against blacks who participated in the project and accepted improvements adjacent to their property. I fail to see how the implementation of this project had a discriminatory effect; the city's assessments on Project 31 impacted more whites than blacks. Simply put, there has been no showing that the conduct of the City of Dothan bears more heavily on one race than another.
 
 
 49
 The district court judge found no discriminatory effect adverse to blacks. The majority of this panel finds this to be clearly erroneous. I believe the district court's decision is amply supported by the evidence. Indeed, had the district court concluded that the city's conduct resulted in discriminatory impact, such a finding might well have been clearly erroneous.
 
 
 50
 I am also concerned that our remand is without any direction. It seems clear that the property owners adjacent to the improved streets who voted for the improvements to be accomplished will continue to enjoy the enhanced value produced by those improvements.[3] However, they are, I assume, not to be required to pay the full assessment for the paving, sewer work, etc. It would be nice were we able to order that this value enhancing work be accomplished at no outlay by anyone, but even federal courts possess no such power. The work cost a considerable amount; that part not paid by the property owners must be paid by others. Unless the city of Dothan has embarked upon some profit generating enterprise, the others who must pay are the citizens of that municipality. The paving to be paid for by these others will benefit property owned more by white owners than black owners. Unless the district court can devise something more appropriate, it seems inevitable that black taxpayers of Dothan whose property value has not been improved by street paving[4] will be taxed to pay the higher city share of paving alongside more white owned property than black owned property. This will be because the plaintiff won this civil rights suit in our court. They can ill afford many more such victories. Perhaps plaintiffs should bear in mind the words spoken by Pyrrhus after a costly battle against Rome in 280 B.C.: "Another such victory ..., and we are undone." Plutarch, Lives: Pyrrhus, Ch. 21 Sec. 9.
 
 
 
 *
 Honorable Jesse E. Eschbach, Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation
 
 
 [1]
 The complaint named as defendants the city and the mayor and city commissioners in their official capacity. Throughout the opinion we refer to the defendants collectively as Dothan
 
 
 [2]
 The district court certified the following two classes:
 Class A: Black property owners of property as of February 1, 1982, within the City of Dothan which was or will be subject to payment of an assessment as a result of special Improvement Project No. 31.
 Class B: Black property owners who have purchased, inherited or otherwise acquired property after February 1, 1982, within the City of Dothan which was or will be subject to payment of an assessment as a result of special Improvement Project No. 31.
 
 
 [3]
 In Yelverton, a voter dilution case, the district court found that government services were "disproportionately bad in the black areas." Id. at 618. In an unpublished companion order issued the same day as the published decision, the court, in part, ordered Dothan "to provide blacks their proportionate share of governmental services."
 
 
 [4]
 On November 21, 1978 Dothan enacted Ordinance No. 5958, which listed the proposed streets to be paved in Project 31 and established the maximum rate of assessment for the project at $24 per assessed linear foot for street paving and $8 per assessed linear foot for sanitary sewer mains. On December 7, 1978 the city commission conducted its first public hearing on the proposed improvements in Project 31. Plaintiffs appeared at this hearing and protested the high assessments. Following the completion of construction in the project, the commission held a second set of public hearings on December 15, 1981 and January 5, 1982. Plaintiffs filed a written protest to the assessments in Project 31 at the January 5, 1982 hearing
 
 
 [5]
 The burden of proof is important because the district court found that plaintiffs failed to prove discriminatory intent and plaintiffs do not challenge this finding on appeal
 
 
 [6]
 Dothan concedes that if plaintiffs' action constitutes an enforcement action they need only prove discriminatory effect
 
 
 [7]
 Plaintiffs rely, in part, on Kirksey v. Board of Supervisors, 554 F.2d 139 (5th Cir.) (en banc), cert. denied, 434 U.S. 968, 98 S.Ct. 512, 54 L.Ed.2d 454 (1977), which held that proof of intent to discriminate was not necessary where the plaintiff had proved that a neutral plan had the discriminatory effect of perpetuating past discrimination. Id. at 143-44. This standard was expressly rejected by the Supreme Court in City of Mobile v. Bolden, 446 U.S. 55, 74, 100 S.Ct. 1490, 1503, 64 L.Ed.2d 47 (1980) (plurality decision). U.S. v. Dallas County Comm'n, 739 F.2d 1579, 1582 (11th Cir.1984). Although evidence of past discrimination may be helpful in proving discriminatory intent, it does not eliminate the plaintiff's burden of proving discriminatory intent. City of Memphis v. Greene, 451 U.S. 100, 116 n. 27, 101 S.Ct. 1584, 1594-95 n. 27, 67 L.Ed.2d 769 (1981); Ammons v. Dade City, 783 F.2d 982, 988 (11th Cir.1986)
 
 
 [8]
 Although Alabama Nursing Home discussed Rule 65(d), it was merely interpreting the scope of the prior district court order rather than invalidating the prior order. All of the other cases cited by Dothan raising the specificity requirement of Fed.R.Civ.P. 65(d) concerned direct appeals of lower court orders
 
 
 [9]
 Evidence of lack of street paving is frequently raised in the context of voter dilution cases. See, e.g., McIntosh County Branch of the NAACP v. City of Darien, 605 F.2d 753, 759-60 (5th Cir.1979)
 
 
 [10]
 The court adopted a "total cost" approach to the computation of the city's contribution. It relied on, and expressly adopted, defendants' exhibit 220, which was a report of all special assessment projects since 1949. The figures in exhibit 220 were based on the special project assessment rolls prepared by Dothan at the completion of each project
 Although the court purported to adopt exhibit 220 in full, it altered the city's contribution to Project 30. In exhibit 220 the city's contribution to Project 30, like the city's contribution to all other projects, was derived by comparing the amount of the city's contribution to the project with the cost of the project as reflected on the special assessment roll. The court changed the city's contribution to Project 30 by comparing the city's total contribution to the project, including its contributions to "related project improvements" that were not assessed against property owners and therefore not included in the assessment roll, with the total costs of Project 30, again including non-assessed related project improvements. The court did not change the city's contributions for previous special projects on the report in the same manner.
 Because the court included non-assessed related project improvements in the city's contribution to Project 30, it concluded that the city's contribution to Project 31 should also include non-assessed related project improvements. The Project 31 assessment roll included for the first time a special column for related project improvements. Project 31 also assessed property owners for sewer repairs and improvements. The Project 31 assessment roll included both of these costs in its total costs for Project 31; therefore the district court did not need to change exhibit 220's computation of Dothan's contribution to Project 31.
 
 
 [11]
 Plaintiffs contend that the district court erred in considering projects other than Projects 30 and 31 because all of the other projects were finalized before the Yelverton decision. They argue that only by comparing projects finalized since Yelverton can the court determine whether Dothan has complied with the Yelverton order to provide government services on an equal basis to its black citizens
 The district court found that Dothan's contribution to Project 30 was significantly higher than contributions to previous projects because of an unavoidable cost overrun. It further found that had the unavoidable cost overrun not existed the total cost for Project 30 would have been the same as in past special projects. The court therefore compared the city's contribution to Project 31 with the city's average contribution to all other projects since 1949.
 Because we find that Project 31 had a discriminatory effect on blacks even if the project is compared with the average contribution to all projects since 1949, which is substantially less than the city's contribution to Project 30, we need not decide whether the district court erred in considering projects completed prior to the Yelverton decision. We note, however, that there is substantial question whether a comparison of projects since Yelverton is possible because although Project 30 was finalized after Yelverton, the city set the maximum possible assessment for the project prior to Yelverton.
 
 
 [12]
 Project 31 covered a residential area in the center of Dothan. Most of the streets in this neighborhood were part of the city street system since the early 1900's and remained unpaved until Project 31 was completed
 
 
 [13]
 Black citizens had to pay substantially higher assessments for paving in Project 31 than whites had to pay in the past. In Project 30, for example, property owners paid only $8 per linear foot of paving. In Project 31 property owners were assessed $24 per linear foot of paving; they were also assessed $8 per linear foot of new sewer service. Although part of the increase in the assessment for Project 31 was caused by inflation and the unexpected cost overrun in Project 30, a large part of the increase was the direct result of Dothan's decreased contribution to the project
 
 
 [14]
 Although plaintiffs were informed of the maximum possible assessment for Project 31 before construction on the project began, and although they had an opportunity to "opt out" of the project if 50% of the property owners on the street agreed, they did not have a real choice. Either they had to opt out because the assessment was too high, and therefore not get their streets paved, or vote to stay in the project and face an unusually high assessment
 
 
 [15]
 The Second Amended Complaint for Declaratory and Injunctive Relief asks for four-part declaratory and injunctive relief:
 (a) a declaration that defendants' contribution of municipal funds to Project 31 violates the Yelverton order and plaintiffs' rights under the Thirteenth and Fourteenth Amendments;
 (b) injunctive relief restraining defendants from allocating funds to Project 31 in a racially discriminatory manner in violation of the Yelverton order and plaintiffs' rights under the Thirteenth and Fourteenth Amendments;
 (c) restructure the assessment costs and the city's contribution to Project 31 on a basis consistent with the Yelverton order and plaintiffs' rights under the Thirteenth and Fourteenth Amendments;
 (d) "credit and/or otherwise restructure" assessments to blacks affected by Project 31 on a basis consistent with the Yelverton order and plaintiffs' rights under the Thirteenth and Fourteenth Amendments.
 Plaintiffs also asked for costs and attorneys' fees under 42 U.S.C. Sec. 1988 and for alternative and additional relief as appeared to the court to be equitable and just.
 In their brief on appeal plaintiffs ask this court to explicitly order the district court to equalize Project 31 assessments to plaintiffs and plaintiffs' class as follows:
 
 
 [1]
 Plaintiffs and Plaintiffs' class members should not be assessed for sewer mains constructed in Project 31;
 
 
 [2]
 The Project 31 assessment for each member of Plaintiffs' class should be restructured to reflect a 48.7% City contribution to the assessable costs (costs excluding related project improvements)
 
 
 [1]
 The district court concluded that the city had contributed 30.2% of the costs of Project 31; the city had contributed 29.35% of the costs of all projects since 1949. The city contributed a substantially larger percentage toward Project 30 due to unanticipated cost overruns
 
 
 [2]
 The City of Dothan, pursuant to Fed.R.Civ.P. 36, admitted that its contribution to Project 30 was 48.7%. The district court, however, found the city's contribution toward Project 30 to be 56.2%. The majority holds that the district court was clearly erroneous for failing to accept the city's "conclusively established" fact. I disagree. First, the difference between these figures is readily explained by the record. Second, whether the district court was right or wrong, no error resulted from the failure to accept the city's admission. The higher percentage found by the district court showed a greater disparity between Project 30 and 31 and therefore worked to the plaintiff's benefit
 
 
 [3]
 Surely, we do not suggest that the district court order the paving broken up and hauled away
 
 
 [4]
 Including those who, when offered participation in Project 31 voted to be left out